BROWN *v.* PEOPLE'S NATIONAL BANK.

1. BILLS AND NOTES — FORGERY — INDORSEMENT — ATTORNEY AND CLIENT—LACHES IN GIVING NOTICE.

Plaintiff was entitled to recover from the defendant, a bank, which paid to her attorney and agent for collection a draft, executed to plaintiff as payee, indorsed by her attorney by forging plaintiff's signature and indorsing his own thereunder, unless she was rightly held to be estopped from enforcing her demand by laches.

2. SAME—ESTOPPEL—DELAY—NEGOTIABLE INSTRUMENTS.

Estoppel barred plaintiff's recovery upon undisputed testimony that her agent knew all the facts incident to her attorney's forgery about a year, during which her agent attempted to assert plaintiff's claim against the attorney, making no claim against the defendant bank, which, in ignorance of the forgery, permitted the delinquent attorney to withdraw funds deposited with it, and lost the means of protecting itself.

Case-made from Jackson; Wiest, J., presiding. Submitted April 2, 1912. (Docket No. 17.) Decided May 31, 1912.

Assumpsit by Catherine Brown against the People's National Bank upon a draft made to plaintiff whose name was forged and the funds drawn by her attorney. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*Grove H. Wolcott*, for appellant.

*Thomas E. Barkworth*, for appellee.

STEERE, J.   This is an action of assumpsit, in which plaintiff seeks to recover the sum of $608.37, with interest from the 4th of June, 1907, by reason of defendant having cashed a draft on that date, payable to her order, on which her name had been forged.

This draft was for plaintiff's distributive share of her father's estate, sent from Washington, D. C., to her attorney, in Jackson, Mich., who forged her indorsement, drew the money, and appropriated it.

Under a plea of the general issue, notice was given of special matters of defense, as follows:

" (1) That the said plaintiff, after having received due notice, and having knowledge, on or about May 1, 1908, that the check or draft mentioned in plaintiff's declaration had been paid by defendant bank to Robert Campbell, without notice that the signature, purporting to be that of plaintiff, indorsed thereon was not her true and genuine signature, did not give to said defendant bank notice of her claim with respect thereto, or of the fact that her purported signature thereto was not genuine, and that said bank had no notice thereof until August 2, 1909, and that in the meantime said bank had surrendered to said Campbell property in its possession out of which it might have saved itself from loss, had such notice of plaintiff's claim been had by it.

"(2) That said plaintiff, having knowledge or notice that said bank had cashed said draft bearing the purported

signature of said plaintiff, elected to follow her claim against Robert Campbell, the party negotiating said draft, and to look to him for repayment therefor, and did not for a long time make any claim against said bank, or seek to hold said bank liable to her on account thereof; and said bank, without notice of said plaintiff's claims or of the false character of said plaintiff's purported signature, was prejudiced thereby by the surrender by it to said Campbell of certain property of value more than enough to have satisfied said obligation, which said surrender was made in ignorance of any claim asserted by said plaintiff against said defendant arising therefrom."

Defendant had judgment at the circuit, and the action is removed to this court on a case-made.

From the statement of facts found by the court, it appears that Robert Campbell, an attorney of Jackson, Mich., having succeeded to the business of the law partnership of which he had previously been a member, and which had been dissolved pending this collection, by virtue of contract relations with plaintiff, in the latter part of May, 1907, received from the administrator of her father's estate a draft reading as follows, with indorsements subsequently made by him:

"$608.        WASHINGTON, D. C., May 27, 1907.
"Pay to the order of Catherine Schilling $608.37 six hundred eight and 37 / 100 dollars.
        "FRED K. ECHELBERGER, Trust Officer.
"THOMAS PARKER, President.
"To the Columbia National Bank, Washington, D. C.
"Paid June 7th, 1907."

Indorsements:
        "CATHERINE SCHILLING.
        "ROBRT. CAMPBELL."

This was for her one-third of the money which said law firm had been employed to collect. Beside the plaintiff, whose name at that time was Catherine Schilling, were a brother and sister, who were each entitled to, and awarded, a like sum. By the terms of a written contract with the firm of which Campbell was a member, the attorney was

entitled to retain 30 per cent., as collection fees, upon the whole amount collected.

The plaintiff's brother and sister were residents of Michigan, and each duly received from Campbell the amount to which they were entitled—$426—being $608.37, less 30 per cent. The plaintiff, however, lived in North Dakota, and never received her share, although she had, in May, 1907, signed and acknowledged, before a notary, a receipt to the administrator for the same. About a year afterward, she wrote to her brother, Capt. Charles J. Smith, in Jackson, that she had not yet received her share of the estate. Smith called upon Campbell for an explanation, and was assured by Campbell that the money had not yet been collected. Not satisfied with Campbell's conduct in the matter, Smith then wrote to the administrator, the Washington Loan & Trust Company of Washington, D. C., and learned from it that the money had been sent to Campbell by draft drawn payable to plaintiff's order. His further inquiries in Jackson developed that the draft was paid by the People's National Bank, defendant herein, to Campbell on June 4, 1907. Shortly after receiving the letter from the administrator, Smith called upon Campbell, and told him that he had learned that he (Campbell) had received plaintiff's draft. Campbell then admitted that he had received the money, and intimated that if he had indorsed Mrs. Schilling's name upon the draft he had a right, as her attorney, to do so, but at the same time promised to settle the claim with Mr. Smith, which promise he never fulfilled. On June 1, 1908, Smith wrote his sister the following letter:

"JACKSON, June 1, 1908.
"*My Dear Sister:*
"Yours at hand. I have a letter from the administrator stating full facts. Campbell has drawn your money from the bank here the 4th day of last June, 1907, and he has kept it. Now, Sister, I have counsel here and they say to make him pay the full amount of $608.37. His contract calls for 30% of that amount. He has broken his contract and we have him. Just leave that to me.

Don't accept anything else. I have been under some expense and I know you will make it right with me. This man Campbell has done wrong. He wanted to bribe me this morning by offering me money, asking me how much he owed me. I will not accept anything from him. I want you to write just as soon as you get this and let me know just what you are doing. Have Winterer write me. You can make him pay the full amount with interest. Katie, don't accept anything else. Have Winterer write him to that effect for I have proof here to land him to prison and he knows it. I saw him this morning, and he said he would pay over the money in one or two days. Now Katie, let me know just what you want me to do, for I am here and I will save you all the expense I can.

"Your brother,
"CAPT. C. J. SMITH,
"235 E. Wesley.

"P. S.—I hope you get this letter before you receive the money which he will try to settle for, about $400.25. Don't do it. If the Bar Association gets hold of him, it will be all off with him.

"C. J. S."

In reply, plaintiff requested her brother to try and collect her money for her, and use his own judgment as to what proceedings to take.

By a letter of May 20, 1908, Smith had learned from the Trust Company of Washington, D. C., that Campbell had requested the draft for Catherine Schilling's share to be made payable to his order; but the same had been previously sent to him, drawn payable to her order. On June 25, 1908, Campbell was arrested on Smith's complaint for embezzling the proceeds of said draft. While in jail, he sent for Smith, and an interview was had at which the sheriff, prosecuting attorney, and F. H. Helmer, cashier of defendant, were present. Helmer, in behalf of Campbell, offered to pay Smith the amount of the draft, less 30 per cent. for attorney's fees specified in the contract for collection, proposing in that connection some kind of paper for Smith to sign, the contents of which are not shown. Smith declined to sign the same, stating he had no counsel, and he was not paid the

money.    The prosecuting attorney stated at the time that
Campbell would be put under bonds.    The criminal pros-
ecution is yet pending, and he is under recognizance for
trial.    After this interview, nothing further was done by
Smith to effect a settlement with Campbell.    At the time
the draft was cashed, Campbell bore a fair reputation as
a member of the bar, and was a customer of defendant,
which had in its possession, until June 27, 1908, personal
property belonging to him amounting to at least three
times the amount of plaintiff's claim.

The indorsement of plaintiff's name on the draft was a
careful imitation of her genuine signature, and was a for-
gery.    No effort was made by the officers of the bank,
when it was cashed, to ascertain whether or not it was
genuine.    Plaintiff never saw the draft until April 21,
1910, and first learned defendant had cashed it from her
present attorney, Mr. Wolcott, who was employed for her
by her brother, July 14, 1909.    Wolcott was unable to
obtain and examine desired papers, and inspect the draft,
until about August 4, 1909, when he advised plaintiff of
the proposed action, and made written demand on defend-
ant for the amount of the draft, with interest, which was
the first notice it received of her intent to hold it responsi-
ble on account of the forged indorsement.    There was no
evidence that any officer of the bank was aware the in-
dorsement was a forgery until that date.

So far as the record discloses, both parties to this suit
were innocent of intentional wrong and honest in this
matter; and both had misplaced confidence in Campbell.
Plaintiff had employed and trusted him as her attorney.
He was then an attorney in fair standing and a customer
of the bank.    When he presented to his bank the draft,
fair on its face, apparently indorsed by the payee and in-
dorsed by himself, the bank naturally cashed it without
question on the strength of his indorsement and their
acquaintance with him.    As her attorney, he had no
authority to indorse her name; and his letter to the ad-
ministrator, requesting that it be made payable to his

order, indicates that he well knew it. The power to indorse checks or bills must be expressly conferred; and his employment to collect her claim conferred no authority to indorse a check or draft received in payment of the claim, but made payable to her. *Chatham Nat. Bank* v. *Hochstadter*, 11 Daly (N. Y.), 343. The indorsement was an ingenious forgery, and conferred upon the bank no right to collect the money it represented, and no protection in cashing it for him. It was her draft, and could only be legally paid on her indorsement. The fact that Campbell was her attorney, and had it in his possession, made no difference. *Prima facie* the loss falls on defendant; for a forgery is a nullity, and no protection to any one. It is manifest she is entitled to recover, unless she is precluded from relying upon the forgery by the defense of equitable estoppel, which is urged by defendant, based on the claim that, by delay and failure to notify the bank within a reasonable time after she knew of the fraud, and by making her claim against Campbell, and attempting to collect it from him, she has released the bank and lost her right against it.

The general rule is that estoppel arises against one who, with knowledge of the fact, fails to give notice until an opportunity of recovery on the forged instrument, which would have been available if prompt notification had been given, is lost:

"If a man's name be forged, and after himself becoming aware of the fact he refrain from advising the holder of the document, and by reason of such inaction the holder's position is changed (by the death, escape, or bankruptcy of the forger, or otherwise), there will be estoppel of the man whose name was forged." Ewart on Estoppel, p. 135.

The forged draft was cashed by defendant June 4, 1907. Defendant had in its possession available personal property of Campbell, furnishing it opportunity to recover on the forged instrument, until June 27, 1908. Demand was first made upon it and notice first given, in her behalf, of

the claim that the indorsement was a forgery on August 4, 1909; and it is conceded that there is no evidence that any officer of the bank knew, before that date, that the instrument was forged.

If plaintiff knew it, or her agent had knowledge of it imputable to her, before June 27, 1908, and defendant's opportunity to recover from Campbell on the forged instrument was lost through failure to give notice, she is estopped from asserting the forgery. . She had no positive knowledge of the forgery of her indorsement until after that time, but did know of enough facts to put a reasonable person on inquiry. . She knew that she had receipted to the administrator for the money in May, 1907. She was advised by a letter from her brother, of June 1, 1908, of Campbell's dishonesty; that he had drawn her money from a bank in Jackson on June 4, 1907; that he had broken his contract and tried to bribe her brother. Following the suggestion in her brother's letter to "just leave that to me," she constituted him her agent, and authorized him to "try and collect her money, and use his own judgment as to what proceeding to take;" in fact, turned the whole matter over to him, with full power to act.

Being on the ground, knowing the "full facts," and vested with complete authority to represent her and act for her in the matter, he elected to proceed against Campbell, not by civil suit, but by criminal prosecution instituted in the public name, presumably for the public good and for the suppression of crime, seeking by criminal process to force the payment of a private debt in contravention of public policy. He made no demand on defendant, and gave it no notice of the forgery. His acts, if known to defendant, were an intimation that the grievance was Campbell's failure to pay her the money after he had obtained it, not in the manner of obtaining it. He at that time knew Campbell had drawn the money from the bank a year previous, on a draft payable to her order, not indorsed by her. He remained silent, and permitted de-

fendant to part with the property of Campbell, by which both parties could have been protected, in ignorance of what he knew, which, if communicated, would have avoided the loss. . It is the common voice of our authorities that notice of a forgery must be given and demand made without unreasonable delay after knowledge; and that this was not done by Smith is patent from the conceded facts. "He had opportunity to speak, it was his duty to speak, and he failed to speak."

It is claimed his agency was special, only for collection of the claim, and such agency did not require him to give the bank notice; nor did his knowledge of the forgery, if he had any, bind the plaintiff. The scope of his agency was to act for and represent her in collecting the money, to collect which this suit is brought. She left it to him to "try and collect it," and use his own judgment as to what proceeding to take. With that authority, his efforts were her efforts, his judgment was her judgment, and his knowledge was her knowledge, in all matters involving that transaction. .

"Because of the identity of principal and agent in dealings by the agent within the scope of his authority, it is a well settled general rule that notice of an agent in the course of his employment, and in relation to a matter within the scope of his actual or apparent authority, is notice to his principal, whether the agent communicates his knowledge to the principal or not." 1 Clarke & Skyles on The Law of Agency, § 474.

See, also, Mechem on Agency, §§ 718, 719.

In *United States* v. *National Exchange Bank* (C. C.), 45 Fed. 163, it was held that the neglect of the drawer of a check, for more than a month after discovery that it had been paid upon a forged indorsement, to notify a bank that it will hold it responsible therefor, releases the bank from liability. In the case at bar, defendant was not notified that it would be held responsible for over a year after the agent had discovered the full facts, and the principal, with knowledge of facts sufficient to put a per-

son on inquiry, had commissioned the agent with full discretionary power.

In *United States* v. *National Exchange Bank, supra*, it was said:

" So, in respect to two persons equally innocent, where one is bound to know and act upon his knowledge, and the other has no means of knowledge, there seems to be no reason for burdening the latter with loss in exoneration of the former; or, if both are equally innocent and equally ignorant, the loss should remain where the chance of business has placed it. *Gloucester Bank* v. *Salem Bank*, 17 Mass. 33; *Bank of U. S.* v. *Bank of Georgia*, 10 Wheat. [U. S.] 333; *Price* v. *Neal*, 3 Burrows (U. S.), 1355."

We are agreed that an equitable estoppel arises in this case by reason of plaintiff's failure to give notice of the fraud to defendant within a reasonable time after it was known to her, or to her authorized agent; and therefore the loss must remain where the chance of business has placed it.

The judgment is affirmed.

MOORE, C. J., and MCALVAY, BROOKE, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.